Sevier Terrace Realty Company v. Commissioner.
Sevier Terrace Realty Co. v. Commissioner
Docket No. 89822.
United States Tax Court
T.C. Memo 1962-242; 1962 Tax Ct. Memo LEXIS 66; 21 T.C.M. (CCH) 1289; T.C.M. (RIA) 62242; October 12, 1962
*66 George D. Webster, Esq., 1000 Vermont Ave., N.W., Washington, D.C., for the petitioner. John W. Holt, Esq., and William C. Sabin, Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion Respondent determined the following deficiencies in the income tax of petitioner: Year
Deficiency
1955
$ 6,933.58
1956
6,126.32
1958
24,258.54
1. The principal question for all of the tax years relates to the basis of lots sold by the petitioner out of a tract of land. Petitioner's basis for the entire tract is conceded to be the same as in the hands of predecessors of petitioner who acquired the tract as heirs of two prior co-owners who had died in 1910 and 1922. Accordingly, the Court is first required to determine the fair market value of the tract as of March 1, 1913 and March 11, 1922 (the date of death of the second co-owner). Another issue in this regard is the allocation of the basis for the entire tract to various portions of tract from which the basis of particular lots can be determined. 2. As to the year 1958, a question is presented as to whether petitioner may deduct the alleged fair market value of 12 lots in the foregoing *67 tract which it had transferred, subject to certain conditions, to a Recreation Center that was operated for the benefit of residents of the subdivision. 3. The final question is whether salaries paid by petitioner to three officers during the taxable years were unreasonable. Findings of Fact Some of the facts have been stipulated, and, as stipulated, they are incorporated herein by reference. Petitioner is a corporation organized under the laws of the State of Tennessee on September 18, 1941. Its office is located at 1010 Sevier Terrace Drive, Kingsport, Tennessee. Its returns for the years 1955, 1956, 1957 and 1958 were filed, on an accrual method of accounting, with the district director of internal revenue for the district of Tennessee (Nashville). Petitioner is the successor to a Virginia corporation (hereinafter referred to as the predecessor corporation) formed on December 31, 1926. In 1941, petitioner, in a tax-free reorganization, acquired all of the assets of the predecessor corporation and assumed its liabilities. The certificates of incorporation of the predecessor corporation and of petitioner stated that one of the purposes for which each was formed was to *68 buy, sell, improve and generally deal in real estate. By deed dated January 26, 1927, the predecessor corporation acquired approximately 303 acres of land, known as the Mount Ida Farm, from the owners by issuance of $100,000 of its $100 par value capital stock. The basis of the property acquired (hereinafter sometimes referred to as the Sevier property) to the predecessor corporation was the same as in the hands of the transferors. The transferors were made up of two groups of heirs; the heirs of Nellie Roller, who died on February 21, 1910, and the heirs of David R. Sevier, who died on March 11, 1922. Nellie Roller and David R. Sevier each owned an undivided one-half interest in the entire tract of land at the time of their deaths. The Sevier property is partly within and partly without the corporate limits of the City of Kingsport, which was incorporated in 1917 and had a population of 5,692 in 1920. In 1913 this property was located in a farming community. A railroad to the Kingsport area was constructed during the years 1908 to 1913, and that area began to develop thereafter. During the years 1913 through 1922, the only access road to the Sevier property was a road, then known *69 as Sullivan Boulevard and later as West Sullivan Street, which ran east and west across the southern portion of the property. Sullivan Boulevard was included in Improvement District No. 18 of the City of Kingsport on February 4, 1919, for the purpose of grading and paving the street, putting in curbs and gutters, and constructing sewers and sidewalks. The cost of such improvements was placed on the city's assessment rolls on December 18, 1923. The portion of the assessments made against the "D. R. Sevier Estate" was as follows: Property Description
Paving
Sewers
Total
Not Subdivided
$ 579.33
$198.31
$ 777.64
Not Subdivided
1,372.88
469.95
1,842.83
Lot
Block
3,4,5
14
502.93
172.16
675.09
2,3,4
15
515.66
515.66
3,4,5
17
502.93
502.93
3
18
171.89
171.89
1,2,3,4,5,6
19
922.78
922.78
9-15
12
1,177.75
1,177.75
$5,746.15
$840.42
$6,586.57
The Sevier property was elliptical in shape, with the length of the property running in a north-south direction. The southern portion was relatively low. The southern tip of the property was bounded by Reedy Creek and was subject to flooding. From the southern portion *70 the property climbed up a hill, sometimes rather steeply, to a plateau at the top. The property was bounded on the east by a creek which ran down the hill and emptied into Reedy Creek. Approximately 76 acres in the northern portion of the property were heavily wooded. In 1913, the Sevier property (except for the wooded area) was being farmed by David R. Sevier; no portion thereof had then been either subdivided or platted. On March 1, 1916, the Kingsport Real Estate Company, Inc. (later called the Kingsport Improvement Company) purchased two adjoining tracts of land, one of which contained 66.53 acres and the other 102 acres, for which it paid $42,500, or approximately $250 an acre. A large part of the acreage purchased was contiguous to the western border of the Sevier property. During 1916, the Kingsport Improvement Company, which owned a substantial amount of property in and around the Kingsport area, sold 21 lots from its Westview Park subdivision which bordered the Sevier property on the west near Sevier Terrace Drive. The average price per loreceived by the company for these lots was $470.59, or approximately $2,350 per acre. During the month of March 1916 18 of the lots *71 were sold. The southern portion of the Sevier property had been platted by 1916 and the sale of lots in that portion of the property started in March 1916. At that time there were dirt roads running north and south of Sullivan Boulevard for a short distance. The lots sold during 1916, 1917 and 1919 were located between an alley running parallel to and immediately south of Sullivan Boulevard and a street now known as Sevier Terrace Drive which runs parallel to and a block or two north of Sullivan Boulevard. In this area 29 lots were sold during 1916, nine during 1917, and four during 1919. The average price per lot received for the 29 lots sold in 1916, without improvements except for dirt access roads, was $401, or approximately $2,000 per acre, before commissions. The lots sold by the predecessor corporation from the Sevier property during the years 1927 through 1939 were all located in the portion of the Sevier property south of Sevier Terrace Drive. No lots were sold north of Sevier Terrace Drive prior to 1940. During the years 1928 through February, 1941, the total sales of real property of the predecessor corporation were approximately 14 1/2 lots which were sold for $5,204 *72 before commissions, 6.11 acres to the Board of Education, Sullivan County, in 1933 for $3,030, $2,400 for an unidentified piece of property to the Eastman Company in 1934, 6 lots were transferred to A. K. Morison in 1938 in exchange for legal services valued at $1,800, and 12.48 acres to the City of Kingsport for use as F. L. Cloud Park for $5,491.20. Those considerations were all before commissions, which commissions were 10 percent, with the exception of 4 lot sales and the lots transferred to A. K. Morison which were all charged with a 5 percent commission, and the property sold to the school board and to Eastman Company which were sold without commissions. After commission, the 12.48 acres listed above were sold for $396 an acre in 1939. In 1918, four years before the death of David R. Sevier, a suit was brought against David R. Sevier by William Roller, widower of Nellie Roller, and final decision was handed down in January, 1927. Prior to her death in 1910 Nellie Roller had received a deed from David R. Sevier for a one-half undivided interest in the Mount Ida property, and the validity of that deed was sustained in the litigation referred to. Upon termination of the litigation, *73 the heirs of Nellie Roller and David R. Sevier, on January 26, 1927, deeded their respective interests in the property to the predecessor corporation in exchange for its stock. Specifically excluded from the deed were 72 lots in the southern portion of the Sevier property which had been conveyed to other parties prior to January 26, 1927. The tract, as thus reduced by the lots which had previously been disposed of, consisted of approximately 303 acres. Two of the recitals in the deed read as follows: THAT WHEREAS, D. R. Sevier, died March 11, 1922, seized and possessed of a one-half undivided interest in a tract of land known as "Mount Ida" hereinafter fully described, and, left surviving him as his sole heirs at law, all of the parties above named as parties of the first part, except William Roller, Sr.; and WHEREAS, Nellie Roller, the deceased wife of the said William Roller, Sr., departed this life February 21st, 1910, seized and possessed of the other one-half undivided interest in and to the said Mount Ida, which interest she acquired by deed from the said D. R. Sevier, of record in the Register's Office for Sullivan County, Tennessee, at Blountville, and which deed was sustained *74 by a decree in the cause of William Roller, Sr., against D. R. Sevier and others, in the chancery court at Kingsport, Tennessee, and all matters and things involved in said suit now have been amicably settled by an agreed decree entered in said cause * * *; One of the heirs signing the deed was Malcolm J. Morison, Sr. At a meeting of the board of directors of the predecessor corporation held on January 26, 1927, a resolution was adopted that, in the judgment of the board of directors, "the net value, in current money of the United States, of real estate conveyed to this corporation by the deed * * * dated the 26th day of January, 1927 * * * is $100,000.00." The predecessor corporation in opening its corporate books made the following journal entries to its asset account "Real Estate": Debit
Credit
Real Estate
$100,000.00
Subscribers
$ 99,000.00
Unearned Surplus
(donated stock)
1,000.00
Real Estate by valua-
tion
239,200.00
Surplus by valuation
239,200.00
In 1927, when the predecessor corporation acquired the 303 acres of the Sevier property there were no access roads and no platting of lots in the portion of that property north of Sevier *75 Terrace Drive. In 1913 and prior to March 11, 1922, that portion of the property, with the exception of approximately 76 acres that were heavily wooded, was being farmed. And in 1913 no portion of the Sevier property, either north or south of what became known as Sevier Terrace Drive, had been platted. In May of 1927 the predecessor corporation held an auction sale of lots on the Sevier property south of Sevier Terrace Drive. The corporation at that time was willing to sell and and all lots platted in the southern portion of its property. The lots sold at the auction totalled 46 1/2 and two lots were given away. The consideration received for the lots sold amounted to approximately $33,210, [1] which averaged about $710 per lot. The cost of improvements made by the predecessor corporation and allocated to the lots sold amounted to $3,287.20. Commissions paid for selling the lots amounted to $4,252.54. Of the lots sold in 1927, 27 1/2 were in the area between Sevier Terrace Drive and Sullivan Boulevard and the remaining 17 were south of that area. *76 In the original return filed by the predecessor corporation for the year 1927, it claimed a basis of $7,797.50 for gain or loss on the 46 1/2 lots sold during that year. Schedule B attached to that return reads as follows: Value of Lots Used as Basis for Determining
Profit or Loss on Sale
305 acres land turned over to Corpo-
ration 1/26/1926 for entire capi-
tal stock of Corporation
1/2 interest inherited from Sevier
valued by State inheritance tax
examiner
$30,000.00
1/2 interest owned by Roller inter-
ests at 3/1/1913 valued at
30,000.00
Total value to Corporation
$60,000.00
52 acres divided into lots
$30,000.00
253 acres unimproved farm lands
30,000.00
Total value
$60,000.00
120 lots valued at $175.00 per lot
$21,000.00
100 lots valued at 90.00 per lot
9,000.00
40 lots valued at nothing
260 Total value lots in 52 acres sub-
divided
$30,000.00 The "delinquent amended return" filed by the predecessor corporation for the year 1927 reflected a credit to surplus of $200,000 designated as "excess of real estate value over capital stock", and in that return it claimed a basis for gain or loss on the 46 1/2 lots sold during that year of *77 $20,857.50. On June 22, 1929, the respondent received a Federal Estate Tax return filed by Malcolm J. Morison, Sr., as administrator of the estate of David R. Sevier. The decedent's unidivided one-half interest in the Sevier property at the time of his death, March 11, 1922, was reported in Schedule A, Real Estate, on page 3 of the return, as follows: Assessed
Fair market
value for year of
value at date of
Description
decedent's death
decedent's death
One-Half Interest in 315 acres farming lands, located
in and near Kingsport, Tennessee
$18,899
$150,000
On February 17, 1931, the respondent mailed a notice of deficiency in income tax for the years 1927 and 1928 to the predecessor corporation. In that notice of deficiency the respondent made the following determination of value, per acre, of the Sevier property: The principal issue under controversy is the proper basis for determining gain or loss upon the sale of real estate which involves (a) a March 1, 1913 value on the land owned on that date and the value of the land acquired in 1922 by inheritance. On the basis of the affidavits and other information submitted and the findings of the revenue *78 agent, a $1,000.00 value on the property inherited in 1922 and a $200.00 value on the property acquired prior to March 1, 1913, have been approved by this office. The deficiencies, totalling $436.45, plus addition to tax of $91.12 for failure to file 1927 return on time and interest, were paid by the predecessor corporation. At a meeting of the board of directors on May 14, 1932, the president of the corporation explained that, if the valuations of the property made by the Bureau of Internal Revenue were accepted, the company would thereafter "deduct, as exempt from income taxes, only $100 per lot," whereas if the values set up by the corporation of $1,000 per acre for "the Nellie Roller one-half interest and $2,500 for the remaining interest could be maintained, the Company would then set up $290 per lot as exempt from income taxes", and that it was the duty of the board to determine whether to bring suit for refund of the $650 paid "in order to establish the right of the Company to deduct the values which it set up as the fair value of the premises." At that meeting a motion was made and it was unanimously - RESOLVED, That this Company file its Petition in the United States District *79 Court, for a refund of the taxes illegally collected from it for the years 1927 and 1928. At a meeting of the board of directors held on May 21, 1934, a motion was unanimously adopted - That the proposed action of this Company against the United States of America for refund of income taxes be abrogated and that no such suit or proceeding be begun. The portion of the Sevier property south of, and including, Sevier Terrace Drive in 1913 consisted of about 70 acres. In a 1916 platting of this acreage approximately 20 percent was allocated to streets and other nonsalable areas and the remainder divided into approximately 318 lots. Seventeen lots were added when this acreage was replatted on February 1, 1927. As already noted, 72 of these lots had been disposed of prior to 1927, so that the number of lots in the southern portion of the Sevier property acquired by the predecessor corporation was approximately 263 and the number of acres about 53. The land acquired by the predecessor corporation in 1927 in the portion of the Sevier property north of Sevier Terrace Drive consisted of about 250 acres. The first platting in this portion of the property for subdivision purposes occurred *80 in 1941; however, only a segment of this portion was then formally platted, and up to the date of the hearing herein there was only a proposed plat for the entire portion. The basis of the undivided one-half interest in the Sevier property acquired from the heirs of Nellie Roller was one-half of the fair market value of the entire 303-acre tract on March 1, 1913. The basis of the undivided one-half interest acquired from the heirs of David R. Sevier was one-half of the fair market value of the entire 303-acre tract on March 11, 1922. The adjusted basis of the tract to petitioner is the sum of the foregoing bases, plus the costs of any capital expenditures or improvements made to the property. The fair market value of the 303-acre tract on March 1, 1913, was $60,600. The fair market value of the 303-acre tract on March 11, 1922, was $303,000. The unadjusted basis to the predecessor corporation and to petitioner of the 303-acre tract for purposes of determining the gain or loss on sales of the property is $181,800. Petitioner's basis for gain or loss on the portion of the Sevier property lying north of Sevier Terrace Drive, exclusive of capital expenditures and improvements, is $111,800. *81 Petitioner's basis for gain or loss on the portion of the Sevier property acquired by it south of Sevier Terrace Drive, exclusive of capital expenditures and improvements, is $70,000, one-fifth of which is allocable to that part south of the alley running parallel and between Lomax and Osceola Streets, and four-fifths is allocable to that part lying north of the alley to Sevier Terrace Drive. The sales of lots by petitioner in 1955, 1956, 1957 and 1958, together with acreage in each lot sold, were as follows 1955 Sales
Lot No.
Block
Acreage
28
23
0.21
9-10-11
22
0.66
15
26
0.26
23
27
0.24
43
23
0.21
27
23
0.19
5
27
0.24
29
22
0.24
26
23
0.30
14
26
0.29
7
27
0.40
1956 Sales
2
24
0.24
6
27
0.26
13
26
0.28
(pt. lot on creek)
12
0.20
15 and 16 (part)
24
0.47
17
24
0.48
18 and 19 (pts.)
24
0.71
8
26
0.34
2
31
0.24
3
31
0.36
4
31
0.23
5
31
0.30
1
36
0.27
2
36
0.25
3
36
0.30
4
36
0.22
41
36
0.30
5
39
0.32
6
39
0.32
7
39
0.33
8
39
0.38
9
39
0.37
10
39
0.33
11
39
0.22
12
39
0.30
1957 Sales
8
27
0.44
1958 Sales
9
27
0.48
30
27
0.24
10
27
0.29
11
28
0.30
24
27
0.24
31
27
0.24
12
28
0.24
16
28
0.24
29
27
0.24
1
37
0.32
28
27
0.24
16
31
0.32
17
28
0.28
1
48
0.25
30
36
0.25
17
31
0.28
31
36
0.18
27
36
0.21
29
36
0.24
2
48
0.25
3
48
0.25
*82 The lot in Block 12 sold in 1956 is located in the portion of the Sevier property south of Sevier Terrace Drive. Petitioner's unadjusted basis for gain or loss on this lot is $300. All of the other lots sold during the taxable years are located in the portion of the Sevier property north of Sevier Terrace Drive. The cost of certain improvements for sewerage made to some of these lots, as set forth and as allocated in Exhibit 29, should be added to the basis of these lots. In its returns for the taxable years, in computing the gain on the lots sold, petitioner used $10 per front foot as the cost basis of each lot sold. In determining the deficiencies the respondent disallowed approximately 80 percent of the unadjusted cost basis claimed by petitioner in its return for each taxable year. The allowance of 20 percent of that basis was the same as that proposed by the revenue agent who investigated petitioner's returns. He resorted to this method of estimating petitioner's cost basis after he was unable to secure from petitioner maps and other information which would permit him to determine whether the basis for the lots sold used by petitioner in its returns was correct. In determining *83 the deficiency for 1958 respondent also made an adjustment in respect of the 1958 sale of lot 9 in Block 27 for $4,000 which had not been reported in petitioner's return. On May 28, 1958, petitioner conveyed 12 lots in Block 28 in the northern portion of the Sevier property to Sevier Terrace Recreation Center, a so-called non-profit corporation organized as a "General Welfare" corporation under Tennessee law and referred to hereinafter as the recreation center. The deed was subject to a number of conditions, which included the following: 1. Said property shall be used exclusively for the construction and maintenance and use thereon of swimming pools, club houses, tennis and other playing courts, gymnasiums and playing fields and the usual incidental structures, fixtures and equipment therefor; and for such other recreational activities thereon not inconsistent with the charter of incorporation of the party of the second part [recreation center] and not contrary to any valid statute, ordinance or regulation of the governing body or bodies having jurisdiction thereover. It is expressly understood and agreed that the use for the purposes indicated herein contemplates a physical *84 use of the specific property herein described and does not contemplate in any sense a use of the proceeds of a sale of said property or of any other disposition thereof, or of any property exchanged or substituted therefor. 2. Said property shall be used only by those who are owners or residents in the residential areas of Sevier Terrace Addition and who are members of the Sevier Terrace Recreation Center and entitled to participate in the activities of said Sevier Terrace Recreation Center under its by-laws; and by such guests of said members permitted by said by-laws to participate in the recreational activities of said Sevier Terrace Recreation Center. Said Addition, for the purposes hereof, is defined as bounded on the north by a county road running generally east and west and connecting Fairview Road with the Tranbarger Hollow Road, on the south by West Center Street, on the east by Reedy Creek, the old E. L. Roller line, Easterling property and others and on the west by the old D. R. Sevier and A. J. Roller lines, and being within the boundaries of and being a part of the old D. R. Sevier farm. 3. Each owner of property in said Addition shall be eligible for membership in *85 said Sevier Terrace Recreation Center by virtue of his ownership; provided (a) such ownership is by direct purchase from the party of the first part [petitioner] or its successor in the development of said Sevier Terrace Addition, and (b) such owner meets such reasonable financial, social and other requirements as may be determined by the governing body of said Sevier Terrace Recreation Center and set out in its bylaws. This paragraph numbered "3" shall be considered a personal covenant for the benefit of the party of the first part and its successors in title, if any, as the developer of the remaining unsold portion of said Sevier Terrace Addition, and may be enforced by the party of the first part or its said successors in title as such developer; and, should the party of the second part, its successors or assigns, by its action or inaction, seek directly or indirectly to limit its membership so that any future purchaser of residential property from the party of the first part or its successors in title as the developer shall not be eligible for membership in said Sever Terrace Recreational Center, he being otherwise acceptable for membership, then the party of the first part, *86 or its said successors in title, shall have a right of action (a) to have the limitation on the membership removed or (b) a right of action for liquidated damages in the sum of $42,000.00, which is considered the present value of the property herein conveyed and said liquidated damages shall be and remain a lien on the property herein described. 4. Said property shall not be sold to, leased to, or in any way assigned to the use of any government, State, Federal or Municipal, nor any breach thereof, nor any board, commission, agency or other instrumentality thereof as a public or private recreation area without the expressed consent of the party of the first part, its successors or assigns, and, if a corporation dissolved, its stockholders or their representatives, evidenced by writing duly executed and acknowledged. For a violation of any of the conditions set out in this paragraph, the title to said property shall immediately revert to and vest in the party of the first part, its successors and assigns, and, if a dissolved corporation, its stockholders or their representatives, and any title of the party of the second part, its successors or assigns, shall be extinguished by the *87 breach of such condition. 5. In the event that said property or a substantial part of same shall be taken for public use in eminent domain proceedings then out of any award for compensation for the taking thereof the party of the first part, its successors or assigns, and, if a corporation dissolved, its stockholders or their representatives, shall be entitled to the award for the land not exceeding $42,000.00, which is considered the present value of said property herein conveyed, and the party of the second part, or its successors, shall be entitled to the award for the improvements, but the award for the land shall be deemed to be prior to any award for the improvements to the extent of said $42,000.00. 6. Said property shall not be used or operated as a commercial enterprise either by the party of the second part, or by anyone claiming by, through, or under it; provided that promotion of occasional recreational and sporting activities and events of unusual significance for the benefit of the party of the second part or its successors and as permitted in said charter of incorporation shall not be considered a violation of this provision. 7. For a substantial, intentional violation *88 of any of the conditions and provisions of paragraphs numbered "1" and "2" above set out, not remedied by appropriate action within sixty days after written notice given to the party of the second part, or its successors, either by mail addressed to it or its successors in Kingsport, Tennessee, or by notice delivered to any one of its officers, then the party of the first part, its successors, assigns, and, if a corporation dissolved, its stockholders or representatives, shall have a right of action to compel compliance with such conditions and provisions; and if such conditions and provisions are not complied with after suit successfully maintained, all the right and title of the party of the second part and its successors in and to said property shall cease and determine and the absolute title thereto shall vest in the party of the first part, its successors or assigns, or, if a dissolved corporation, in its stockholders or their representatives. A waiver of any one or more violations of any of the conditions or provisions of paragraphs numbered "1" and "2" above set out shall not operate as a waiver of any subsequent violation nor of any previous violation which has been cured *89 or corrected. 8. In the event said property shall not be used for the purposes set out in the paragraph numbered "1" above, or in the judgment of the party of the second part or its successors it becomes impractical to use said property for said purposes and same is not so used for a period of one year (except in case of war or national emergency declared precluding such use), then the title to said property shall revert to the party of the first part, its successors or assigns, and, if a corporation dissolved, to its stockholders or representatives. The party of the second part, for itself and its successors, covenants and agrees that it will use said property for the installation, maintenance and operation of the recreational facilities hereinbefore set out and referred to and permitted under its charter; that all such recreational facilities, structures, equipment, club houses and other improvements shall be erected and maintained with due regard to the general harmony and appearance of the area where said property is located; that no shacks, toolhouses, outhouses or any other unsightly or obnoxious buildings shall be erected or maintained on said premises; that proper bathhouse *90 and sanitation facilities be provided and that they be in conformity with the requirements of the building code and health ordinances of the City of Kingsport; and that any swimming pool be properly enclosed by at least a substantial fence which will not permit entry to the pool area except through gateways provided. The purpose of this transaction was to make the remaining lots more desirable, enhance their value and thereby to stimulate sales, and it had that effect. No officer of petitioner has ever been an officer of the recreation center. On its 1958 income tax return petitioner claimed $42,000 as a deduction for advertising expense, being the alleged fair market value of the 12 aforesaid lots. The respondent disallowed this deduction. Malcolm J. Morison, Sr. was secretarytreasurer of the petitioner during the taxable years. He has held this position, with the exception of two years, since 1927 in petitioner and its predecessor. He owns 183 shares of the common stock of petitioner out of a total outstanding of 520. He devoted his full time to the affairs of petitioner. He had charge of the grading of streets, installation of sewers and other improvements, and handled petitioner's *91 taxes and other financial transactions. He received a salary of $6,000 per year from petitioner for his services in each of the taxable years. The salary received constituted reasonable compensation for the services he rendered. George F. Dugger, Jr., an attorney and the president of petitioner, owns five percent of its outstanding stock. He directed the legal services performed for petitioner. He made many out-of-town trips on business of petitioner. During the taxable years he devoted approximately 10 to 15 percent of his time to the affairs of petitioner. He received a salary of $1,500 per year from petitioner in each of the taxable years for services rendered. The salary received constituted reasonable compensation for those services. William H. Thomas, vice president of petitioner, owns 160 shares of its outstanding stock. He is a member of the Tax Equalization Board of Sullivan County. He devoted about 50 percent of his time to the affairs of petitioner during the taxable years. He helped to set petitioner's sales policy and to promote sales of its lots. For services rendered to petitioner he received from it in each of the taxable years a salary of $3,000 per year. The salary *92 received constituted reasonable compensation for the services he rendered. Opinion RAUM, Judge: 1. Basis. (a) Petitioner's predecessor corporation acquired a tract of 303 acres in 1927, known as the Sevier property. The land had been the subject of protracted litigation which finally terminated early in that year. In 1913 the property (except for some 76 heavily wooded acres to the north) was being farmed by David R. Sevier. He had previously given a deed to an undivided one-half interest in the property to Nellie Roller, who died in 1910. The litigation referred to was commenced in 1918 by Nellie Roller's widower against David R. Sevier, and was continued after the latter's death on March 11, 1922, against his heirs. The validity of the deed to Nellie Roller was established in the final decree, with the result that in 1927 her heirs and Sevier's heirs were each held to be entitled to an undivided one-half interest in the property. Both sets of heirs conveyed their interests to the predecessor corporation which appears to have been organized as a convenient means for exploiting and disposing of the property, and the present petitioner is merely a successor to that corporation. *93 It is agreed by the parties that the unadjusted basis of the property in the hands of both corporations is the same as it was in the hands of the transferring heirs. And it is further agreed that the basis of Nellie Roller's heirs was one-half the fair market value of the property on March 1, 1913, whereas the basis of David R. Sevier's heirs was one-half the fair market value of the property on March 11, 1922, the date of his death. However, the parties are in sharp disagreement as to the values as of each of those dates. The trial was devoted largely to this valuation issue. We received a mass of evidence, much of which was not presented in a well-organized or clear manner. There was considerable conflict in the evidence, and from time to time we did not find particular testimony credible. Using our best judgment on all the evidence we have made a finding that the fair market value of the entire 303-acre tract was $60,600 on March 1, 1913, and $303,000 on March 11, 1922, with the result that the unadjusted basis (the sum of one-half of each of these figures) is $181,800. In making these valuations we, of course, considered the highest and best use to which the property could *94 be put on each of the critical dates, and the values found by us are higher than at the rate of $100 and $750 an acre in 1913 and 1922, respectively, for which the Government contended. On the other hand, petitioner's contention that the property had a value of at least $2,500 and $3,500 an acre at the critical dates is utterly unrealistic. It bases its position largely upon sales of certain lots from the property in 1916 and 1927 as well as upon the sales of some lots in a contiguous subdivision, Westview Park, in 1916. In the first place, as to 1913 value, conditions in 1916 and, a fortiori, in 1927, appear to have been quite different from those existing in 1913. Although the railroad was completed around 1913, the City of Kingsport was not incorporated until 1917, petitioner's property in 1913 was merely farm land (apart from a thickly wooded area), and only in 1916 does it appear that the southern portion was platted into lots. Meanwhile, in March 1916 a real estate company, which dominated the field, purchased two nearby tracts at approximately $250 an acre. We are fully satisfied that in 1913 the highest and best use for petitioner's property as a whole was either as farm *95 land, or, at best, as land held for sale to a speculator or developer who would be willing to wait a long period of years before a market could be found for all of the land in the form of lots. No such market for lots in the entire area was available in 1913 or in the reasonably foreseeable future. Although the sale of some lots might perhaps have been foreseen in 1913, we would not be justified in concluding that any such market for the entire area, or even of a significant portion thereof, could reasonably be treated as an existing reality at that time. We think that our finding of March 1, 1913 value, at the rate of $200 an acre, represents the most that a willing buyer would in fact have paid a willing seller for the property at that time. By 1922, however, the situation had changed materially. The southern portion of the property had been platted and sales therefrom commenced in 1916. Also, lots were sold in 1916 from a contiguous development. These are significant facts that must be taken into account, and we have given considerable weight thereto in our finding as to the 1922 value. But it must be remembered, as shown by the evidence, that the southern portion which had been *96 platted was to the south of Sevier Terrace Drive; that the area to the north consisted of some 250 inaccessible acres which were then (1922) only farm lands and dense woods; that only a portion of the lots in the southern, or platted portion had been sold by 1922; that there was severe competition from a real estate company that dominated the field; that the northern portion, although superior in a sense, could not be developed without expending large amounts of money; and that no lots north of Sevier Terrace Drive were in fact sold prior to 1941. Accordingly, although a substantially higher value for the property is called for in 1922 than in 1913, it would be fallacious to arrive at such value by attributing to the entire 303-acre tract a value, on an acreage basis, measured by the amounts received from the sales of the limited number of lots disposed of at about that time. The fact is that although some lots might have been sold at that time the entire parcel was not then ripe for development and sale, lot by lot, at any such prices. The history of the property negates the existence of any such market as far back as 1922. Considering the tract as a whole it is our judgment that *97 willing buyers or a willing buyer would not have paid a willing seller more than an average of $1,000 an acre for all the property involved, and we have in effect so found in concluding that the property had a fair market value of $303,000 on March 11, 1922. In reaching this conclusion we note that David R. Sevier's estate tax return, filed for some unexplained reason in 1929, reported the fair market value of "One-Half Interest in 315 acres farming land, located in and near Kingsport, Tennessee" owned by the decedent at the time of his death to be $150,000. At the trial, Malcolm J. Morison, Sr., the administrator, testified, in response to a question from petitioner's counsel which virtually suggested the answer to him, that he thought he was merely valuing a "claim" of the decedent to a one-half undivided interest. We heard that testimony, and the short answer is that we do not believe it. The evidence as a whole, together with the internal evidence in the return itself, satisfies us that the property itself was being valued and not a "claim" thereto. [2]
*98 (b) Having determined that the tract as a whole has an unadjusted basis of $181,800 in petitioner's hands, it next becomes necessary to allocate that basis among various portions of the tract. Both parties appear to agree that such allocation should be made as of 1927 when petitioner's predecessor corporation acquired the property. We do not pass upon the correctness of that date as opposed to 1922 in this connection, because the situation in 1927 in regard to the property does not appear on the record before us to be materially different from that existing in 1922, and there is no argument by the parties that the allocations for which each contends would be significantly different as of 1922. For purposes of the allocation petitioner urges that the tract be divided into four sections, two in the portion south of Sevier Terrace Drive and two in the portion north of Sevier Terrace Drive, and seeks to have approximately 93 percent of the basis allocated to the northern portion. Such an allocation would, of course, be highly beneficial to petitioner since the lots sold during the taxable years were, with but one exception, in the area north of Sevier Terrace Drive. We do not agree *99 with any such allocation. In both 1922 and 1927 the southern portion had been platted into lots, but the acreage north of Sevier Terrace Drive had not yet been subdivided. That northern portion consisted of undeveloped farm and timber lands to which there were no access roads at that time, and we see no justification for dividing it, in turn, into two sections in order to allocate a disproportionate amount of basis to one of such proposed sections which, in our judgment, was not more valuable in 1922 or 1927, notwithstanding that such section may have become more valuable at a later time. Moreover, we do not agree that the northern portion as a whole had a higher per acre value at that time than the portion south of Sevier Terrace Drive, even though there was some testimony to that effect, based upon its superior topography that might render it more valuable at a later time when it could profitably be opened for development. The evidence as a whole convincingly establishes that the most valuable portion of the Sevier property, both in 1922 and in 1927, was the portion surrounding Sullivan Boulevard and the laterals running north and south of that boulevard where lots were being sold. *100 It also convincingly establishes that in those years the lots surrounding Sullivan Boulevard were more valuable than the lots platted in 1916 and replatted in 1927 in that part of the southern portion of the property south of the alley running parallel and between Lomax and Osceola Streets some of which were at times inundated by the overflow from Reedy Creek. After a careful consideration of all of the evidence, we have reached the conclusion and found as a fact that petitioner's basis for gain or loss which we have determined to be $181,800, exclusive of capital expenditures and improvements, is allocable as follows: To the portion of the Sevier property lying north of Sevier Terrace Drive - $111,800. To the portion of the Sevier property lying south of Sevier Terrace Drive $70,000, one-fifth of which is allocable to that part south of the alley running parallel and between Lomax and Osceola Streets, and four-fifths to that part lying north of the alley to Sevier Terrace Drive. (c) There remains finally the problem of determining the basis of the individual lots sold during the taxable years 1955, 1956 and 1958. One of these, a lot on a creek in Block 12 in the southern portion *101 of the property (i.e., south of Sevier Terrace Drive), was sold in 1956. We have found as a fact that petitioner's unadjusted basis for this lot is $300. The remaining lots were located in the northern portion of the property. The acreage in each lot sold during the taxable years is shown in our findings, and we leave it to the parties to allocate to each an aliquot portion of the basis determined herein for the northern portion of the property. This allocation may be made under Rule 50. 2. Lots conveyed to recreation center. In 1958 petitioner conveyed 12 of its lots to a recreation center, a so-called nonprofit corporation, on the condition, among others, that the grantee would build and maintain on these lots a swimming pool and other recreational facilities. It was contemplated that membership in the recreation center would be open to purchasers of lots from petitioner's subdivision. Provision was made for reversion of the 12 lots to petitioner for failure to comply with various specified conditions. Also, in the event of possible future condemnation of these lots by eminent domain, proceeds of the award up to $42,000 were to be paid to petitioner. Petitioner contends that *102 it is entitled to deduct $42,000, the alleged fair market value of these 12 lots in 1958, as an advertising expense. The Government argues that the transaction was capital in nature, that no part of the value of the lots is deductible as an expense, that the basis for those 12 lots should be spread among and added to the basis of the remaining unsold lots in the subdivision, and that in any event even if petitioner were correct in claiming an expense deduction, such deduction must be limited by the basis of the 12 lots. We do not find it necessary to pass upon the latter contention because, in our judgment, petitioner is not entitled to any expense deduction in relation to these 12 lots. Plainly, the development of the recreation center enhanced the value of petitioner's remaining lots, made them more desirable and in this manner stimulated sales. But this is a far cry from concluding that the transfer of the 12 lots was an advertising expense. It was a capital transaction similar to the construction of streets, sewers, utility lines and the like. Expenditures for such purposes or the dedication of a portion of the subdivision's property for such purposes are clearly capital in nature, *103 notwithstanding that they may be intended to stimulate sales; they are of continuing benefit to the remaining lots and are recoverable by the owner upon sale of such remaining lots rather than through the medium of expense deductions. Cf. . In , the Court of Appeals for the Sixth Circuit said (p. 717): It has been consistently held that the cost of improvements to subdivided real estate held for sale is a capital expenditure, allocable to the basis of the various unsold lots, to be realized by the developer upon his ultimate sale of the property. The cost of each lot for the purposes of determining gain or loss includes a pro rata portion of payments made for permanent improvements to the subdivision as a whole for the benefit of lots to be sold, such as construction of streets and drives, construction of a sewer disposal system, and the cost of securing an extension of gas and electric service to the subdivision. * * * The thought implicit in the foregoing was the basis for the decision in , which *104 is virtually indistinguishable from the present case. There a corporation was organized to develop a tract of land as a residential subdivision, and, as part of its plan for development, donated one-half of the tract to a nonprofit country club. After noting that the dominant purpose in transferring the land was to bring about the construction of a country club so as to induce persons to buy nearby lots, this Court held that the cost of the property transferred should be regarded as part of the basis of the retained lots. We think that the present case calls for the same result, and that (C.A. 6), reversing , relied upon by petitioner, is to be sharply distinguished on its facts. That case involved the cost of publishing a catalog which listed products sold by the taxpayer. Here we have a transaction that is plainly capital in nature, which enhanced the value of petitioner's lots held for sale, and it is not converted into an advertising expense merely because it stimulated sales. Many capital improvements - e.g., the installation of air conditioning in a housing development - may stimulate sales, *105 but the essential character of the expenditure as a capital outlay is not thereby altered so as to convert it into a deductible advertising expense. We hold that the Commissioner properly disallowed the deduction. [3]
3. Reasonableness of salaries. We are finally called upon to decide whether the Commissioner properly *106 disallowed deductions for the salaries paid during the taxable years to three of petitioner's officers, namely, Malcolm J. Morison, Sr., George F. Dugger, and William H. Thomas. The Commissioner disallowed most of the deductions claimed in the returns on the ground that the salaries constituted unreasonable compensation for the services rendered. In this we think he erred. Petitioner was engaged in an extensive business operation over a long period of years, and the officers in question contributed useful services, although perhaps somewhat exaggerated by them in their testimony. The salaries involved were modest, and after considering the evidence, which is summarized in our findings, we have reached the conclusion and found as a fact that the compensation paid to each of them in each of the taxable years constituted reasonable compensation for services rendered. Decision will be entered under Rule 50. Footnotes
1. In a "delinquent amended return" filed by the predecessor corporation for 1927 it reported the sale of 46 1/2 lots during that year for a total consideration of $32,665.↩
2. Moreover, it does not appear on this record that Sevier's right to at least one-half the property was ever in contest. The litigation did involve the validity of his deed to Nellie Roller for the other one-half, but we have no clear and credible evidence that Sevier's one-half was ever in jeopardy. However, we do not rest our finding on this consideration.↩
3. Moreover, and wholly apart from the Government's contention that the deduction, even if allowable, must be limited to the basis of the 12 lots, it is clear that no deduction in any such amount as $42,000 would in any event be allowable. That amount represents the alleged fair market value of the 12 lots. But these lots were not donated without restriction. The conditions in the deed were so restrictive in character that the fair market value of the lots, as thus restricted, was substantially less than their fair market value without restriction. Cf. ; Gary Black, 38 T.C. -. And if the deduction were to be measured by the fair market value of what was in fact given, that deduction would be only a fraction of $42,000 in the light of the restrictions and conditions in the deed which are set forth in our findings.↩